# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION

UNITED STATES OF AMERICA

v.  No. 5:21-cr-24-BJB

MAURICUS S. HAYNES

\*\*\*\*\*

## OPINION & ORDER

Officer Blake Quinn of the Paducah Police Department encountered a man he believed to be Mauricus Haynes—whom he suspected of transporting synthetic marijuana and fleeing from law enforcement—on two occasions. But Haynes got away both times. Officer Quinn wasn't going to miss his third chance. So he pulled Haynes over on a pretext: turning right from the shoulder in violation of a traffic law. Quinn admitted that he extended the traffic stop beyond its necessary duration and scope in order to investigate the drugs and flight. When he did so, officers saw a gun in the car that Haynes—a convicted felon—was not allowed to have. Haynes again fled, but was eventually apprehended. This federal criminal prosecution followed his allegedly unlawful possession of that gun.

Haynes now argues (among many other points) that the initiation and extension of the stop were likewise unlawful. And on that basis he contends the gun should be suppressed under the Fourth Amendment and the Supreme Court's exclusionary rule. But because Officer Quinn had probable cause to pull over the car and reasonable suspicion—based largely on his recognition of Haynes from the prior investigation—to extend the stop, the seizure of Haynes and the gun were lawful. So the Court rejects the objections to the report and recommendation (DN 54) and denies the motion to suppress (DN 29).

### I.

Officer Quinn of the Paducah Police Department apparently first learned of Mauricus Haynes in October 2020.[1] Quinn pulled over a maroon Mercury Grand

---

[1] The report and recommendation (DN 49) prepared by Magistrate Judge King accurately describes the record regarding the encounters between Officer Quinn and Haynes that led to this prosecution and motion to suppress. In response to issues newly raised during and after Judge King's first suppression hearing, the Court held a second suppression hearing. DN 60.

1

Marquis that happened to have been stolen—though its theft hadn't yet been reported. Incident Report (DN 63-1) at 3. As Quinn approached the vehicle, the driver "crack[ed] the window." First Hearing Tr. (DN 40) at 23:16. The driver claimed not to have identification and sped away when Quinn asked him to spell his name. Second Hearing Tr. (DN 60) at 6:2–6:8. Other Paducah police officers soon recovered the abandoned vehicle and found a gun and several pounds of synthetic marijuana in the car. *Id.* at 6:9–11. The owner of the vehicle reported it stolen later that day—on October 1, 2020. Incident Report at 3.

Hoping to identify the driver, Quinn circulated his body-camera footage within the Department "to see if anyone could determine who this person was." Second Hearing Tr. 6:15–6:17. Detective Willenborg indicated that the driver "could possibly be Mauricus Haynes" and provided Quinn with video of the stop of a man who (to Quinn) looked "very similar" to and "bore the resemblance" of Haynes. *Id.* at 6:18–6:24. The resemblance was close enough that Quinn wanted to find Haynes—both to see if he recognized him as the driver of the stolen car and to ask him about the incident. *Id.* at 6:24–7:7. Quinn admittedly didn't go to great lengths to locate Haynes, *see* First Hearing Tr. at 24:8–26:2, but kept an eye out when patrolling the area where Haynes "hung out," *id.* at 23:24–24:2.

Months later, Quinn—by happenstance—found a different car registered to Haynes. On February 13, Quinn "ran a registration check in [his] vehicle for … [a] gray 2012 Dodge Charger" parked outside the 20/20 Club on North Eighth Street in Paducah. Second Hearing Tr. at 17:17–19. The report showed that the car was registered to Haynes. *Id.*[2] Quinn circled back, but the car was gone. *Id.* at 22:21–22:23. Quinn continued his patrol—deciding not to enter the club because he figured that Haynes had left with his car (if he had been there at all). *Id.* When Quinn started his next shift, he told his fellow officers to watch for Haynes and the Dodge Charger that Quinn had identified the night before. *Id.* at 22:3–22:12.

---

This opinion's discussion of the facts rests on testimony from both hearings, the dash-camera videos, and the documentary record. *See* 28 U.S.C. § 636(b)(1)(C) (Following timely objections to an R&R, "[t]he judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.").

[2] Although after the first suppression hearing the record didn't establish "why Quinn felt the need to locate Haynes" that day, R&R at 1, Quinn's testimony during the second hearing explained that his identification of a car registered to Haynes was the apparently fortuitous result of a random registration check, *see* n.1 above. One of Quinn's "duties as a patrolman [was to] do random registration checks of vehicles on or near the roadway" in order to identify individuals with warrants or cars with expired registrations. Second Hearing Tr. 17:22–17:25. One such check turned up Haynes's Charger.

2

Quinn himself saw the car later in the evening and began to follow it. First Hearing Tr. 5:24–6:3. After observing the vehicle cross a solid white line onto the shoulder to pass a car on the right while turning at a stoplight, Quinn "initiated a traffic stop to stop him for the improper lane usage." First Hearing Tr. 6:1–6:6. Along with Logan Barrow, the "cover officer," Quinn approached the stopped vehicle and asked Haynes to roll down his window and hand over his license and insurance information. *Id.* at 6:18. Haynes cracked his window, provided the license, and continued to look for his insurance while Quinn headed back to his cruiser. Government's Exhibit 1 (Officer Quinn's Body Camera Footage) at 1:48–1:54. Barrow stayed by the car and continued to engage with Haynes and the passenger in the front seat next to him. *Id.* at 1:55–2:00.

Quinn relayed Haynes's license number to the dispatcher, *id.* at 2:25–2:35, who (about one minute later) responded that Haynes had a "valid driver's license" and "d[id not] have any warrants." First Hearing Tr. 47:24–47:25. Quinn returned to the Charger, and after "confirm[ing] his identification … asked him to step out of the vehicle to continue [the stolen-car] investigation." Second Hearing Tr. 4:18–4:20; *see also id.* at 16:2–16:7; First Hearing Tr. 15:5–15:7. As Haynes got out, Barrow noticed a firearm in the driver's-side door and alerted Quinn. Second Hearing Tr. 4:20–4:21. Based on his earlier investigation into Haynes, Quinn knew that Haynes was a convicted felon and therefore "prohibited from possessing a firearm." First Hearing Tr. 17:16–17:18. So once Barrow alerted him to the gun, Quinn attempted to detain Haynes as a felon in possession. But Haynes resisted and fled—knocking both officers to the ground and avoiding Barrow's attempt to tase him. First Hearing Tr. 14:4–14:18. The police couldn't find Haynes that night, so they towed the Charger and let his passenger go home. *Id.* at 17:5–17:23. Quinn completed a criminal complaint for an arrest warrant, which was authorized before he finished his shift that morning. *Id.* at 17:20–17:23. Based on that warrant, police arrested Haynes the following day after he called 911 to report that his vehicle had been stolen. *Id.* 17:24–18:3.

## II.

Haynes filed a barebones motion to suppress the gun (and any other evidence) seized from the car "[b]ecause the traffic stop was illegal." Motion to Suppress (DN 29) at 1. Magistrate Judge King, per a referral, held a hearing, ordered post-hearing briefing, and issued a report and recommendation to deny the motion to suppress. R&R at 6. He concluded that probable cause supported the stop: Quinn saw Haynes cross the white line to the right of another vehicle and therefore reasonably believed Haynes violated a traffic law by driving on (and turning from) the shoulder. R&R at

3

3–4 (citing Ky. Rev. Stat. § 189.340(3)(b)).[3] Judge King also rejected "four additional arguments in support of suppression of the firearm" that Haynes made in his post-hearing memorandum: 1) the traffic stop was "pretextual," 2) officers "improperly extended" the traffic stop, 3) a purported *Brady* violation warranted suppression, and 4) the car search was "improper." *Id.* at 4–6.

Haynes, through counsel, timely objected. Initial Objections (DN 50). Haynes himself then sent a two-page, hand-written letter to Judge King (DN 51), who construed and docketed it as additional objections, (DN 52). The Court denied both without prejudice and ordered Haynes's lawyer to refile a single consolidated submission. *See* DN 53 at 1. Haynes did, *see* Consolidated Objections (DN 54), and the United States responded (DN 55)—revisiting issues previously discussed in their post-hearing briefs and raising additional concerns about the reasonableness of the duration of the stop. Given holes in the record, the Court ordered and held a second suppression hearing to address, among other things, the duration of the stop and basis for its extension.

Quinn and Barrow testified at the second hearing. Quinn testified concerning his decisions to follow, stop, and arrest Haynes. Much of the questioning focused on his decision to ask Haynes to step out of the vehicle after Haynes's license and registration came back clean. The Court invited supplemental briefing on the new issues discussed at the hearing, Second Hearing Tr. 31:14–32:13, which the parties provided, DNs 62 & 63. This opinion and order reviews de novo the portions of the R&R that Haynes properly objected to. *See* 18 U.S.C. § 636(b)(1)(C); *United States v. Quinney*, 238 F. App'x 150, 152 (6th Cir. 2007).

---

[3] The R&R (at 3) noted that Quinn's probable cause might rest on a violation of Ky. Rev. Stat. § 189.380(2) as well. That provision requires that "[a] signal indicating the intention to turn right or left shall be given continuously for not less than the last one hundred (100) feet traveled by the motor vehicle before the turn." Ky. Rev. Stat. § 189.380. After reviewing the dash-cam video, Quinn testified "that Haynes only signaled once his vehicle had stopped." R&R at 3 (citing .380). This testimony might indicate that Quinn, when he stopped Haynes, believed he committed a turn-signal violation (.380) in addition to the lane violation (.340(3)(b)). This could've provided an alternative basis for probable cause. *See, e.g., United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (probable cause turns "on what the officer knew *at the time he made the stop*") (emphasis in original). Or the testimony might represent an after-the-fact justification for the stop based only on Quinn's review of the video, which would not have supported probable cause. *See id.* ("If an officer … only discovered after the stop or arrest that the suspect had committed a traffic violation, a court could not find that probable cause existed."). Ultimately, the Court need not decide, because the turn from the shoulder suffices on its own.

4

### III.

**1. Pretext.** Haynes first requests suppression because Quinn and Barrow "testified that the stop was a total pretext" and that they "were simply looking for an excuse to pull him over." Consolidated Objections at 1. But a pretextual stop supported by probable cause is not grounds for suppression. *Ferguson*, 8 F.3d at 391. Indeed, "police officers may stop a vehicle that commits a traffic violation and look for evidence of a crime, even if the traffic stop is merely a pretext …." *Hernandez v. Boles*, 949 F.3d 251, 257 (6th Cir. 2020). In other words, "[w]hen a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) (quoting *United states v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)).

Because Quinn testified that he initiated the contested traffic stop "for the improper lane usage," First Hearing Tr. at 6:05–6:06, after he observed Haynes "le[ave] the roadway across the solid line to make [a] right-hand turn onto Park Avenue," *id.* at 9:16–9:17, Quinn's frank admission that it was "a pretextual stop" is irrelevant, Second Hearing Tr. 15:3. To be sure, Quinn "got behind" Haynes's car because he "wanted to talk to [Haynes] about the previous case where he fled … and had 3 pounds of synthetic marijuana in the [stolen] car[.]" First Hearing Tr. 46:13, 38:10–38:12. But he also observed what he believed to be a traffic violation, which is all that he needed to have probable cause to initiate the traffic stop.

**2. Probable Cause.**[4] Haynes also argues that Quinn, regardless of his subjective motivation, lacked probable cause to pull him over for the purported traffic violation. According to Haynes, "no traffic violation actually occurred." Consolidated Objections at 1, 3. He explains that he "traveled upon the right side of the highway; approached the right turn and performed the right turn as close as practicable to the right-hand curb or edge of the roadway; and passed upon the right of another vehicle where there was unobstructed pavement of sufficient width for two or more vehicles traveling in the same direction." *Id.* at 3. This maneuver, according to Haynes, was

---

[4] "There is a degree of confusion in this circuit over the legal standard governing traffic stops." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007). "Although virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation, this circuit has required probable cause to justify an investigatory stop for completed misdemeanor traffic violations." *United States v. Guajardo*, 388 F. App'x 483, 487 (6th Cir. 2010) (quotation marks omitted). But the standard is *lower* for suspected criminal activity: "In the context of vehicle stops, … officers may stop a vehicle with probable cause to believe a traffic violation or other civil infraction was committed, or where the stop is supported by reasonable suspicion of criminal activity." *United States v. Salas*, 820 F. App'x 405, 411 (6th Cir. 2020) (citing *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016)).

5

perfectly legal; even Quinn acknowledged Haynes had "room … for a vehicle to get into that lane and turn" because the lane was "for parking." *Id.* (quoting First Hearing Tr. at 42:24–43:1). So Quinn's stop rested on a mistake of law and lacked probable cause. *Id.*

But "officers may make certain reasonable mistakes and still have probable cause." *United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022). "[T]he question whether probable cause existed to believe that there was a violation of the statute is different from whether a violation in fact occurred." *United States v. Collazo*, 818 F.3d 247, 255 (6th Cir. 2016). Indeed, "innocent behavior will form the grounds for probable cause" from time to time. *United States v. Wright*, 16 F.3d 1429, 1438 (6th Cir. 1994). As long as probable cause to suspect a traffic violation is based on an "objectively reasonable" reading of the statute—that is, the conduct was not "clearly permitted" under the law—disputes about whether conduct was or was not legal is not dispositive. *Stevenson*, 43 F.4th at 646. So even if Haynes were correct that Quinn misinterpreted Kentucky law—a question the Court need not decide to resolve the motion to suppress—he must still address whether Quinn's purported misinterpretation was unreasonable.

It wasn't. The record doesn't show that Haynes's conduct was "clearly permitted" or that Quinn's understanding of the law was not "objectively reasonable." *Id.* at 646. Ky. Rev. Stat. § 189.340(3)(b) provides that the "operator of a vehicle may overtake and pass upon the right of another vehicle" only upon "a roadway with unobstructed pavement of sufficient width for two (2) or more lines of vehicles moving lawfully in the direction being traveled by the overtaking vehicle." Put another way, a driver may pass on the right *only* on "a roadway" of sufficient width. Ky. Rev. Stat. § 189.340(3)(b). Kentucky law excludes the "berm or shoulder" of a road from the definition of "roadway[.]" Ky. Rev. Stat. § 189.010(10). And testimony at the first suppression hearing established that the rightmost lane of North Eighth Street—which Haynes entered to turn onto Park Avenue—was a shoulder. First Hearing Tr. at 57:24–58:7, 72:19–72:21.

Although Haynes argues that his reading of Kentucky law is better than Quinn's, the officer's interpretation of this statute at least "was objectively reasonable." *Stevenson*, 43 F.4th at 646. Quinn's testimony is unrebutted, and Judge King's conclusion to this effect is amply supported in the record. R&R at 3–4. Quinn testified that he saw Haynes drive "over the solid white line to pass another vehicle to make a right turn." First Hearing Tr. 6:3–4. "[A]ny Department of Transportation line that's solid," Quinn explained, "indicates that you're not to cross that boundary in the regular operation of your vehicle." *Id.* at 41:23–25. "[I]t's not legal," he continued, "to drive in a non-travel lane on a roadway" when passing another car. *Id.* at 10:7–9. This aligns with the testimony of a Kentucky highway engineer, Everett

6

Lloyd Wilson, who testified that a "white, solid edge line" with "no breaks in [the] edge line" indicates that the shoulder in question shouldn't "be used as a turn lane." *Id.* at 56:24–57:10; *see also id.* at 58:3–58:5 (Wilson corroborating Quinn's testimony that the area in question was "a shoulder or parking area, not a lane of travel"). Because the record makes it almost certain that Haynes drove onto the shoulder of the road to make the turn, Haynes cannot say that his conduct was "clearly permitted" under the statute.

Under Quinn's reading of § 189.340(3)(b), Haynes violated the law when he used the shoulder to turn right. "Don't pull to the right of a car and turn from the shoulder" is a reasonable interpretation of the statute and a reasonable description of what Quinn saw. So he had probable cause to pull over the Charger. *See Stevenson*, 43 F.4th at 647; *see also United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (driver's failure to use a turn signal provides probable cause to justify a traffic stop irrespective of the officer's subjective intent); *United States v. Miller*, 413 F. App'x 841, 843 (6th Cir. 2011) (failure to signal).

**3. Extended stop.** Both sides more or less agree[5] that "Quinn abandoned the mission of the traffic stop to pursue purposes or tasks unrelated to his main objective of addressing a traffic violation" when he asked Haynes to exit the car. Consolidated Objections at 7 (cleaned up).[6] The principal question, then, is whether reasonable

---

[5] The Government half-heartedly contends that "the initial portion of the stop was not yet completed" because "Haynes was still searching for his proof of insurance during this portion of the stop." Response to Objections at 6. But Quinn expressed no interest in investigating Haynes's insurance status and told him to put down the insurance information so he could get out to discuss the prior offenses. Government's Exhibit 1 at 5:25–5:35 (Quinn telling Haynes to put down the insurance-related papers and get out of the car).

[6] The United States argued after the initial hearing that Judge King should not even consider Haynes's argument regarding the extension of the stop or the propriety of the vehicle search because Haynes failed to timely raise it. *See* Post-Hearing Memorandum in Opposition at 1; Response to Objections at 3, 6. To be sure, Haynes's original motion to suppress did not mention either argument, though it at least raised the *issue* of suppression based on the unlawfulness of the stop. *See* DN 29 at 1; *Mills v. Barnard*, 869 F.3d 473, 483 (6th Cir. 2017) (distinguishing issues and arguments in support for forfeiture purposes). In any event, Haynes's cross-examination of Quinn at the hearing implicated the question whether he improperly extended the stop. *See* First Hearing Tr. at 48:01–48:11; *United States v. Howard*, 216 F. App'x 463, 469 (6th Cir. 2007) (defendant adequately raised issue during suppression hearing if not in motion to suppress). Judge King reasonably agreed with Haynes that the issue's development, though halting and indirect, didn't amount to forfeiture or waiver. R&R at 4 n.1.

Even so, the issue's delayed ripening still created a potential problem: the Government bore the burden of demonstrating the stop's consistency with the Fourth Amendment, yet was unable to develop a record on a point not raised in the pre-hearing brief. Response to

7

suspicion justified Quinn's extension of the stop. *See United States v. Whitley*, 34 F.4th 522, 531–32 (6th Cir. 2022) (requiring "independent reasonable suspicion" when a "traffic stop has been prolonged").

Quinn prolonged the stop when he shifted focus from the traffic stop to his investigation of the October 2020 stolen-car incident. "Stopping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012). The pretextual traffic stop authorized Quinn to "seize" (stop) Haynes—but only as long as necessary to conduct an ordinary traffic stop based on the lane violation. *See Whitley*, 34 F.4th at 529 (valid stop must be "limited in scope and duration") (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). An officer's legitimate authority during a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (quotation marks omitted). "Even minor police actions aimed at 'detecting evidence of ordinary criminal wrongdoing' or any purpose beyond addressing the traffic infraction are not "tasks incident to the stop." *Id.* at 924 (quoting *Rodriguez*, 575 U.S. at 355). "If the stopped party can show either that the police activity was not tied to the traffic infraction or that the traffic stop reasonably should have been already completed, then the traffic stop has been prolonged." *Whitley*, 34 F.4th at 531–32 (cleaned up).

As to scope, Quinn's "police activity" after running the driver's license "was not tied to the traffic infraction." *Id.* He frankly admitted that he wanted "to continue the investigation" for unrelated crimes: "the stolen vehicle, the fleeing and evading, and then possession of a handgun by a convicted felon, etc." First Hearing Tr. at 48:4–48:6. Quinn planned to ask Haynes about the previous investigation "and try to get his side of the story." *Id.* at 48:9–48:10; *see also id.* at 15:1–15:7 ("I asked him to step out of the vehicle where I could continue that investigation."). If Haynes "provide[d] evidence to show that it wasn't him," then Quinn said he planned to release him. *Id.* at 48:10–48:11.

And as to duration, in all likelihood "the traffic stop reasonably should have been already completed" by the time Quinn ordered Haynes out of the car. *Whitley*, 34 F.4th at 531–32. After Quinn ran Haynes's license through the database, he apparently had had enough time to decide whether to issue a ticket for the improper-lane violation; certainly nothing in the record indicated he needed to order Haynes

---

Objections at 3, 6. But the Court addressed any prejudice faced by the Government by authorizing supplemental briefing and holding a second evidentiary hearing, when both parties addressed this issue directly and developed their factual record. So to the extent the Government continues to press for denial based on forfeiture, the Court disagrees and finds the issue adequately—though ultimately unsuccessfully—presented.

out of the car to write up a lane-infraction ticket. Dispatch told Quinn that Haynes had "a valid driver's license" and did not "have any warrants," and Quinn himself told Haynes to forget about finding his insurance information. First Hearing Tr. at 47:24–47:25. So Quinn's "initial mission ended when [he] approached the car for a second time, because at that point [he] either could have issued a ticket or allowed [Haynes] to leave." *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023).[7]

The principal question, as noted above, is whether Quinn had a lawful basis to justify the extension. Officers may prolong a traffic stop if they develop "reasonable suspicion of criminal activity." *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). "Reasonable suspicion is not a high bar" because "the officer needs only 'a minimal level of objective justification for the stop[.]'" *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The question is whether the basis for that suspicion, "when viewed in the totality of the circumstances, supported a determination that there was at least a moderate chance of finding evidence of illegality." *United States v. Semaj Williams*, No. 22-1522, 2023 WL 5206439, at *2 (6th Cir. Aug. 14, 2023) (cleaned up).

Based on Quinn's unrebutted testimony, the extension was lawful because Quinn had "reasonable grounds to believe that" Haynes was "wanted for past criminal conduct." *United States v. Cortez*, 449 U.S. 411, 417 n.2 (1981). As in the Sixth Circuit's decision in *United States v. Salas*, "this was not a simple routine traffic stop, but rather arose out of [a prior] investigation[.]" 820 F. App'x 405, 412 (6th Cir. 2020). "Based on these prior investigative actions, [Quinn] had reason to suspect criminal activity even before the stop occurred." *Id.* Quinn prolonged the traffic stop in order "to continue the investigation" into the October 2020 stop—including "the stolen vehicle, the fleeing and evading[,] and then possession of a handgun by a convicted

---

[7] In at least some circumstances, a law-enforcement officer may order an occupant out of a car for safety reasons, regardless of reasonable suspicion, without unconstitutionally seizing that person. *See Rodriguez*, 575 U.S. at 356 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977)); *United States v. Lash*, 665 F. App'x 428, 431 (6th Cir. 2016) ("Even without a reason to be suspicious, an officer may order the driver to get out of the vehicle during a traffic stop to ensure his own safety during the encounter.") (quotation marks omitted); *Salas*, 820 F. App'x 405, 411 (6th Cir. 2020) ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop *and attend to related safety concerns.*" *Id.* (cleaned up and emphasis added). But here the Government doesn't argue that Quinn had a safety-related reason to order Haynes out of the car apart from investigating the prior criminal activity. So "[e]ven if asking [the occupant] to exit the vehicle is properly considered a safety measure, it is still a detour that requires independent reasonable suspicion because the request facilitated the investigation into [unrelated crimes] and did not pertain to the original traffic stop." *Whitley*, 34 F.4th at 530.

9

felon, etc." First Hearing Tr. 48:4–48:6. Quinn's suspicion rested on his belief that Haynes was driving the Charger and was the person who fled from him the previous fall. In the wake of that incident, Quinn had reviewed his body-camera footage and compared it to footage from Detective Willenborg of an encounter with Haynes. Second Hearing Tr. 6:15–22. That information led him to suspect that Haynes was the driver who got away in October 2020, which is why the fortuitous registration check on the Charger piqued his interest. Second Hearing Tr. 17:17–18:14.

Features of the February 2021 stop reinforced Quinn's suspicion that Haynes was his runaway driver. When Quinn approached the vehicle, Haynes rolled down his window just enough to hand Quinn his driver's license—just as the driver in the October stop had done. First Hearing Tr. 23:15–17 (Quinn: "on both incidents, [Haynes] cracks the window. He doesn't roll it all the way down[.]"); *see Salas*, 820 F. App'x at 412 ("The circumstances of this delivery were also substantially similar to the prior deliveries[.]"). And when Quinn saw Haynes through the cracked window, Quinn "immediately recognized" Haynes as the person from the October 2020 stop, his body-camera footage, and Detective Willenborg's video. First Hearing Tr. 15:3–15:5; *see Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) ("[T]he officer's reasonable suspicion ... can be derived from such sources as informant tips, dispatch information, and directions from other officers."). Finally, all three encounters occurred in the same part of town. First Hearing Tr. 24:9–24:13 ("I knew him to frequent the area that I saw him in.").

Unlike *Rodriguez*, this was hardly "[a] seizure justified only by a police-observed traffic violation" that "bec[a]me unlawful [because] it [wa]s prolonged beyond the time reasonably required to complete [the stop's] mission' of issuing a ticket for the violation." 575 U.S. at 350 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Rather, Quinn had reasonable suspicion to prolong the stop to investigate Haynes's involvement in the October 2020 stop. To be sure, most post-*Rodriguez* caselaw addresses different fact patterns: ones in which the reasonable suspicion was almost or entirely developed during—rather than before—the traffic stop. *See, e.g.*, *Lott*, 954 F.3d at 923 ("A seizure can be extended if something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.") (quotation marks omitted) (emphasis in original); *Salas*, 820 F. App'x at 412 (collecting cases). Here Quinn's repeated encounters with Haynes, confirmed during the stop at issue, easily allowed him to clear the "minimal level of objective justification" needed for reasonable suspicion. *Wardlow*, 528 U.S at 123. Because the "totality of the circumstances establishe[d] a factual basis upon which an officer could reasonably suspect that" Haynes was the suspect of a crime, Quinn's extension of the traffic stop was adequately supported by reasonable suspicion. *Whitley*, 34 F.4th at 535.

**4. Search of the Vehicle.** Haynes also argues for suppression because, in his view, the car should not have been searched incident to his arrest under the standard described in *Arizona v. Gant*, 556 U.S. 332 (2009). Haynes's Post-Hearing Memorandum in Support (DN 47) at 21. Haynes contends (wrongly) that a search incident to arrest is appropriate *only* when the arrestee "could gain access to the vehicle at the time of the search" and was, therefore, inappropriate here because he was neither "under arrest" nor able to "gain access to the vehicle." *Id.*

Why this matters is not entirely clear. The Paducah Police never conducted a search incident to arrest. And Haynes abandoned the gun in his car when he fled. The gun was the catalyst for Haynes's (eventual) arrest—not the fruit of a search incident to his arrest for some other reason. So *Gant* has no apparent bearing on this case.

The likeliest explanation is that Haynes raises this point to rebut the first of the Government's string of alternative arguments. At various points it has argued the gun shouldn't be suppressed—even if the stop had been originally invalid or unlawfully elongated—because of the "inevitable discovery doctrine," DN 62 at 6–7, the "attenuation doctrine," *id.* at 4–6, and Haynes's abandonment of the car (and therefore the gun), DN 55 at 6–7. Because the Court doesn't rely on those alternative rationales to deny the motion to suppress, addressing these alternative rebuttals is unnecessary.[8]

**5. *Brady*.** Haynes finally argues that suppression is warranted because he "was not provided with numerous pieces of evidence" that he claims would "cast a shadow over Officer Quinn's investigation" if he had access to them during the first suppression hearing. Consolidated Objections at 7. According to Haynes, the Government's failure to produce these documents amounts to a *Brady* violation that justifies suppression.

---

[8] Of these arguments, the one that received the most attention in the Government's papers and at the evidentiary hearing was the rather adventurous argument that once Quinn pulled over Haynes, police would've inevitably discovered the gun. *See* Government's Supplemental Memorandum at 4–7; Haynes's Supplemental Memorandum (DN 63) at 8–12; Second Hearing Tr. at 9:1–11:11, 19:6–21:9 (discussing a purported policy of the Paducah police department to tow, impound, and inventory search all vehicles lacking insurance). Suffice to say the record does not make *certain* that the Paducah Police would've *inevitably* concluded Haynes lacked car insurance, charged him with that violation, towed his car on a snowy night, conducted an inventory search, and found the gun. "Although some speculation about how events would have unfolded in the absence of the illegal search is necessary under [the inevitable discovery] doctrine, we must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (quotation marks omitted).

11

Neither the Supreme Court nor the Sixth Circuit has "decided whether *Brady* protections are applicable to a suppression hearing." *United States v. Taylor*, 471 F. App'x 499, 520 (6th Cir. 2012). But even assuming *Brady* applies, Haynes has not carried his burden. Relief under *Brady* requires (1) exculpatory or impeaching evidence, (2) government suppression, and (3) prejudice. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). This argument fails all three prongs.

First, the record doesn't show that the evidence at issue is either exculpatory or impeaching. Haynes argues that the government unlawfully withheld a report summarizing "[i]nformation obtained from the search of Mr. Haynes's cell phone[,]" a "request for evidence examination" form dated October 2020 (after the stolen-car incident), a second evidence-examination request from February 2021 (after Haynes's arrest), a state incident report from October 2020, and a Paducah Police investigative report from February 2021. Consolidated Objections at 7. He doesn't contend that any of the contested evidence is exculpatory, but does seem to suggest that the documents hold some impeachment value: they purportedly "contai[n] a great deal of information that cast a shadow over Officer Quinn's investigation[.]" *Id.* at 7. Even assuming this is right, Haynes's decision not to use any of the documents during the second hearing casts doubt on their exculpatory or impeachment value.

Second, Haynes points to nothing rebutting the Government's contention that it "w[as] not in possession" of these documents until Haynes "filed them as exhibits in the record." Response to Objections at 5. "[T]he government cannot be accused of suppressing evidence it did not have," *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018). And Haynes hasn't even attempted to overcome the Government's representation.

Third, Haynes has not established (or even argued) prejudice. "The prejudice prong essentially asks whether the withheld favorable evidence was also material." *McNeill v. Bagley*, 10 F.4th 588, 601 (6th Cir. 2021) ("'The standard is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the [outcome.]'") (quoting *Strickler*, 527 U.S. at 289). Haynes merely contends that the contested evidence would "cast a shadow over Officer Quinn's investigation." Consolidated Objections at 7. But Haynes doesn't indicate how this "shadow" would or should impact the Court's probable cause or reasonable suspicion analysis. And the "mere possibility that an item of undisclosed information might have helped the defense … does not establish 'materiality' in the constitutional sense." *Taylor*, 471 F. App'x at 521 (quotation marks omitted). If that were not enough, Haynes *had* and *used* all but one of the contested documents at the first suppression hearing. *See* First Hearing Tr. 26, 31, 33, 55 (introducing all four contested police reports). And as to the cell-phone report, he apparently had it during

12

the second hearing—but did *not* use it.  The "result of the proceeding," therefore, was the same with and without the evidence.  *McNeill v. Bagley*, 10 F.4th at 598.

## ORDER

The Court overrules Haynes's objections to the report and recommendation (DN 54) and denies his motion to suppress (DN 29).

Benjamin Beaton, District Judge
United States District Court

September 7, 2023